| | AUSA:   Ronald Waterstreet | Telephone:  (313) 226-9100 |
|---|---|---|
| | Special Agent:   Robert Holbrook | Telephone:  (313) 965-2323 |

AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the

## Eastern District of Michigan

| | |
|---|---|
| United States of America | |
| v. | |
| Yifei Chu | Case No. |
| a.k.a. Philip Chu | |

Case: 2:22−mj−30460
Assigned To : Unassigned
Assign. Date : 10/21/2022
SEALED MATTER (LH)

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ____August 11, 2021 and January 26, 2022____ in the county of _____Washtenaw_____ in the
_____Eastern_____ District of _____Michigan_____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1001 | False Statements |
| 18 U.S.C. § 1519 | Falsification of records in a federal investigation |

This criminal complaint is based on these facts:

See attached affidavit

☑ Continued on the attached sheet.

_Complainant's signature_

Robert Holbrook, Special Agent, FBI
_Printed name and title_

Sworn to before me and signed in my presence
and/or by reliable electronic means.

Date:  October 21, 2022

City and state:  Detroit, MI

_Judge's signature_

David R. Grand
_Printed name and title_

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| IN THE MATTER OF THE CRIMINAL COMPLAINT AND ARREST OF: **YIFEI CHU (ALSO KNOWN AS PHILIP CHU)** | Case No. **Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A CRIMINAL COMPLAINT**

I, Robert Holbrook, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.     I make this affidavit in support of an application for a criminal complaint and arrest warrant charging Yifei CHU (also known as Philip CHU; hereinafter "CHU"), a Taiwanese born citizen who now resides in Michigan and is a naturalized U.S. citizen, with violations of Title 18, United State Code, Sections 1001 (false statements) and 1519 (falsification of records in a federal investigation), related to false statements and misrepresentations made by CHU in an attempt to obtain a security clearance, which was a necessary requirement for a job CHU was seeking with the United States Navy at a United States embassy overseas.

2.     I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been since 2019. I have received Basic Field training at the FBI Academy

in Quantico, Virginia, as well as additional training and courses in counterintelligence investigations and operations. I am currently assigned to the FBI's Counterintelligence Division, Detroit Field Office, located at 477 Michigan Avenue, Detroit, Michigan. The FBI's Counterintelligence Division is responsible for exposing, preventing, and investigating ongoing national security threats from foreign intelligence services and other intelligence activities within the United States. During my time conducting counterintelligence investigations, I have sworn to numerous search warrants and have aided in the indictment of multiple individuals.

3.     The facts in this affidavit come from my work on the investigation described herein, as well as information obtained from other agents and/or witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrant and does not set forth all my knowledge about this matter.

## EXECUTIVE SUMMARY

4.     CHU, who is a current employee of the National Oceanic and Atmospheric Administration (NOAA), recently applied for a three-year detailed assignment to the United States Embassy in Singapore working for the United States Navy in the Office of Naval Research Global. To obtain this position, CHU was required to apply for and obtain a security clearance so that CHU could have access

2

to classified national security information. CHU made false statements during the security-clearance application process on three separate occasions. First, he made false statements on the security clearance application itself. Second, he made false statements when he was interviewed under oath by federal background investigators. And third, he made false statements when he signed an affidavit regarding his security-clearance application.

CHU's false statements were made to hide his extensive contacts with members of the Taiwanese Navy and a Taiwanese company, including the fact that CHU was hired by the Taiwanese company to provide consulting services on a "classified" Taiwanese Navy project, and that he met on multiple occasions with members of the Taiwanese Navy on a military base in Taiwan in performance of his consulting services. The consulting services CHU provided the Taiwanese Navy were related to work he had previously done for the United States Navy prior to his employment with NOAA.

In addition to hiding his relationship with the Taiwanese Navy, CHU also made false statements designed to conceal that:

(a)    he lived in Taiwan for approximately 11 months during 2020 and 2021, unbeknownst to the federal agency that employs him;

(b)    he obtained a new Taiwanese passport, which he used to travel to Taiwan in 2020 and 2022;

3

(c)     he is currently a citizen of Taiwan;

(d)     he has had foreign financial interests, including previous ownership of a condominium in Taiwan; and

(e)     he used an email account and Taiwanese phone numbers while living in Taiwan during 2020 and 2021.

## RELEVANT STATUTES

Title 18 U.S.C. § 1001 provides as follows:

Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully-
   (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
   (2) makes any materially false, fictitious, or fraudulent statement or representation; or
   (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;

shall be fined under this title, imprisoned not more than 5 years….”

Title 18 U.S.C. § 1519 provides as follows;

Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation to or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both.

4

## **PROBABLE CAUSE**

Background Regarding CHU's Employment and Security Clearance Application

5.      CHU was born in Taiwan and became a naturalized United States citizen on April 2, 2008. On April 9, 2008, CHU applied for a security clearance at the "Secret" level, which was required for employment with the Naval Research Laboratory (NRL), United States Department of the Navy (U.S. Navy), Department of Defense (DoD). A security clearance allows an individual filling a specific position with the United States government to have access to classified national security information up to and including the level of clearance that they hold if the individual has signed a Classified Information Nondisclosure Agreement (commonly known as "Standard Form 312") and has a need to know the information. The classification level of "Secret" applies "to information the unauthorized disclosure of which reasonably could be expected to cause serious damage to the national security . . . ." 22 C.F.R. § 9.4(b)(2). To obtain a security clearance, CHU was required to submit a "Questionnaire for National Security Positions" also known as "Standard Form 86" (SF-86), be interviewed by federal background investigators, and pass an adjudication of his background investigation. From about April 27, 2009, to about October 3, 2015, CHU was employed as a Research Oceanographer at the NRL and held a Secret clearance throughout the time of his employment at

5

NRL. During his background investigation for his position at NRL, CHU affirmed that he had renounced his Taiwanese citizenship and was required to destroy his Taiwanese passport. CHU submitted documentation confirming that the Taiwanese passport was destroyed in September 2008 as requested.

6.      The FBI's investigation has identified a resume of CHU which described his work at NRL as the development and implementation of coupled air-ocean-wave forecast models for the U.S. Navy and the transition of these models into U.S. Navy operational forecast centers. For example, on September 28, 2012, CHU was listed as the "Responsible Person" for a published research article from NRL. The article states: "There is a strong need for the US Navy to develop relocatable, operational coastal forecast systems to support naval missions in coastal and semi-enclosed seas. Naval Research Laboratory (NRL) has been actively working on the development of multiple global and regional ocean models for that purpose (Chu et al. 2009) . . . Products of those models such as water levels, currents and temperature are used to support fleet navigation, Mine Warfare (MIW), diver operations, and so forth."

7.      After leaving NRL, on October 5, 2015, CHU began employment as a Supervisory Physical Scientist at the Great Lakes Environmental Research Laboratory (GLERL), National Oceanic and Atmospheric Administration (NOAA),

Department of Commerce (DOC), located at 4840 South State Road, Ann Arbor, Michigan 48108.

8.     On or about December 7, 2020, CHU applied for a position as a Science Director for the Office of Naval Research Global (ONRG), U.S. Navy, DoD. This position required a "Secret" security clearance.   The position would be a three-year detail at the U.S. Embassy in Singapore.   At the time, Chu was employed by NOAA and living in Taiwan without NOAA's official approval.

9.     On or about April 6, 2021, CHU was provisionally selected and assigned to the Singapore Office for the three-year detail position at the U.S. Embassy in Singapore. Upon completion of this assignment, CHU would return to his role at NOAA. CHU is currently employed at the GLERL and is awaiting adjudication of his background investigation for a Secret clearance.

10.     The Science Director Program is described on the ONRG website, onr.navy.mil, as follows:

> The Office of Naval Research (ONR) Global International Science Program employs technically skilled scientists and engineers to enhance the international science and technology (S&T) engagement of the Navy and to increase the Navy´s awareness of global technology. The technical staff, known as science directors—typically scientists with doctorates working across government, academia and industry— work out of offices around the world to scout technologies for ONR and the Naval Research Enterprise (NRE).

7

A science director completes a two- to four-year tour in which he/she visits international S&T institutions to develop access and find cutting-edge science and technology, assesses international innovation in areas of naval interest, provides global technical assessment, follows trends in science and technology, and tracks technological development in specific geographical areas. The science director recommends innovative researchers to be awarded research grants.

11.     As the position of Science Director for the ONRG required a security clearance, CHU once again was obligated to apply for and obtain a security clearance so that he could have access to classified national security information during his work with the U.S. Navy. This necessitated CHU to complete and submit a new Standard Form 86 (SF-86), be interviewed by federal background investigators, and pass an adjudication of his background investigation.

12.     On August 11, 2021, CHU, via a computer using the Electronic Questionnaires for Investigations Processing (e-QIP) portal, certified and submitted his SF-86. Under the "Statement of Understanding" section on the SF-86, CHU marked "Yes" to the following statement:

I have read the instructions and I understand that if I withhold, misrepresent, or falsify information on this form, I am subject to the penalties for inaccurate or false statement (per U.S. Criminal Code, Title 18, section 1001), denial or revocation of a security clearance, and/or removal and debarment from Federal Service.

13.     On January 26, 2022, background investigators working on CHU's SF-86 spoke with CHU by video-conference. At the beginning of the interview, CHU

8

was informed of the penalties for inaccurate or false statements. During this video-conference, the investigators also placed CHU under oath, by swearing under penalty of perjury, under the laws of the United States, that the information he was about to provide would be true and complete to the best of his knowledge and belief. The investigators and CHU then went over the details of his electronically filed SF-86. As the video-conference proceeded, the investigators wrote down all of CHU's answers to the SF-86, thereby creating an affidavit.

14.     Later that same day, one of the background investigators met with CHU in person at his residence in Ypsilanti, Michigan. During this meeting, CHU was presented with the affidavit. In the presence of the background investigator, CHU read, corrected, initialed, and signed this affidavit under penalty of perjury. On the signature page of the affidavit, which CHU signed, it stated the following:

> I have read this document consisting of 14 pages, each of which I have initialed or signed. I have made the corrections shown and placed my initials opposite or near each correction. Under penalty of perjury pursuant to 18 U.S.C. § 1621 or other applicable authority, this document is true and complete to the best of my knowledge and belief and is made of my own free will, without any threat, promise of immunity, or inducement. I understand that the information which I have given is not to be considered confidential and that it may be shown to, or discussed with, the interested parties.

CHU's False Statements on His Security Clearance Application

15.    The FBI's investigation has revealed that CHU made several false statements on his security clearance application that he submitted on August 11, 2021; during his video-conference interview, while under oath, by federal background investigators; and when he signed his affidavit on January 26, 2022. These false statements pertained to a variety of topics, including his contacts and business relationship with a Taiwanese company and the Taiwanese Navy, his residence in Taiwan for an approximately 11-month period, his possession and use of a Taiwanese passport, his Taiwanese citizenship, his foreign financial interests, and use of an email address and telephone numbers while living in Taiwan.

CHU's Contacts and Business Relationship with
a Taiwanese Company and the Taiwanese Navy

16.    On or about December 4, 2015, after leaving his "Secret" security clearance position with the U.S. Navy at NRL, and beginning his employment at NOAA in October 2015, CHU began communicating via his NOAA email account with a Professor at a Taiwan University (herein "the Taiwan University"), in Taipei, Taiwan (herein "Taiwanese University Professor").

17.    From about December 4, 2015, to about February 1, 2016, CHU and the Taiwanese University Professor exchanged emails with each other and arranged to meet at a science conference in New Orleans, Louisiana, which led to the

10

Taiwanese University Professor offering CHU the opportunity to work on a "potential project." During an email sent to CHU, on or about June 18, 2016, the Taiwanese University Professor referenced a discussion at their arranged meeting pertaining to CHU's participation in the proposed project in Taiwan. The Taiwanese University Professor also offered payment for CHU's travel and a possible monthly allowance. In the communication, the Taiwanese University Professor also stated, "[b]ecause this potential project has some *classified information*, I cannot tell you too much at this moment" (emphasis added).

18.     The same day, CHU replied to the Taiwanese University Professor and agreed to proceed with the proposal, stating, "I would be delighted to collaborate with you on the proposal if you think I could help in model development, implementation and operations." The following day, the Taiwanese University Professor informed CHU: "Through the process of an outside company, we can actually put you as a consultant and provide some stipends from this project." The Taiwanese University Professor then identified the "outside company" by name (herein "Taiwanese Company 1") and introduced CHU to two of the "outside company" representatives and identified these two individuals by name – both of whom were former Taiwanese Naval officials (herein "Former Taiwanese Navy Official #1" and "Former Taiwanese Navy Official #2"). Former Taiwanese Navy

Official #1 and Former Taiwanese Navy Official #2 were "CC'ed" in this communication. The Taiwanese University Professor further identified these two individuals having "retired from the Navy." Additionally, the Taiwanese University Professor described Former Taiwanese Navy Official #1 as the "former director of [the Taiwanese] Navy Meteorology & Oceanography Bureau[.]" Further investigation by the FBI has determined that Former Taiwanese Navy Official #1, was the Director of Taiwanese Naval Meteorological and Oceanographic Office from November 1, 2008, to June 30, 2011.

19.    Furthermore, the Taiwanese University Professor provided more details for the project and stated, "So, now, you will understand what the sensitive information I talked about. A part of this project is actually related to the implementation of NCOM in Taiwan. That's why I recommend you to help. So your involvement will be essential." NCOM is known by your affiant as the Navy Coastal Ocean Model. During CHU's employment with the United States Navy Research Laboratory during 2009-2015, he was involved with the development and implementation of air-ocean-wave forecast models for the U.S. Navy, which included the Navy Coastal Ocean Model (NCOM).

20.    On the same day, June 19, 2016, Former Taiwanese Navy Official #2 sent an email to CHU. In this email, Former Taiwanese Navy Official #2 made

12

additional introductions and added additional recipients ("CC'ed"). One additional recipient was identified to CHU by the individual's rank and last name (herein "the Taiwanese Navy Captain"). Former Taiwanese Navy Official #2 also introduced the Taiwanese Navy Captain as one of his "many Navy friends" and had the email sent to CHU also sent to the Taiwanese Navy Captain's personal email address at gmail.com.

21.     Investigation has revealed that the Taiwanese Navy Captain was the Director of the Taiwan Naval Meteorological and Oceanographic Office, Ministry of National Defense, Republic of China,[1] from August 1, 2013, to November 15, 2018.   Therefore, the Taiwanese Navy Captain was the Director during the period that CHU agreed to be a consultant on the classified project for the Taiwanese Navy.

22.     CHU also received an email attachment containing a briefing by the Taiwanese Naval Meteorological and Oceanographic Office. In this briefing, the Taiwanese Naval Meteorological and Oceanographic Office is described as "…mainly responsible for the battlefield environmental information of the naval operations and strongly supports to [sic] all kinds of naval and other military needs."

---

[1] The Republic of China is another name for Taiwan.

13

The Taiwanese Naval Meteorological and Oceanographic Office was stated to have locations in Taipei, Taiwan, and Kaohsiung, Taiwan.

23.     From about June 20, 2016, to about June 22, 2016, CHU was directed by Former Taiwanese Navy Official #1 to provide a Chinese version of his Curriculum Vitae and a signed Chinese document. Through use of a commonly used machine translator, the Chinese document was identified as a "Letter of Intent," signed by CHU, detailing his commitment to working on NCOM for Taiwanese Company 1. Further, the signed document contains the handwritten alpha-numeric number (partially redacted) "Y#####1560," which has been identified to be CHU's Taiwanese National Identification Number. Notably, on or about June 21, 2016, CHU sent the signed document to Former Taiwanese Navy Official #2.

24.     From about August 24, 2016, to about November 10, 2016, CHU, exchanged approximately 21 emails with the Taiwanese University Professor confirming and arranging CHU's contracted work in Taiwan for "the Navy project" located at the Navy base in Kaohsiung. During these communications, CHU was informed that his flight and stay in Kaohsiung would be reimbursed by Taiwanese Company 1. Further, CHU was informed he would receive "$10'000 per month" to cover his "per diem" while in Taiwan, which would be paid by the Taiwan

University. [2] CHU arranged his stay in Taiwan from November 24, 2016, to December 5, 2016. During this time, the Taiwanese University Professor developed a schedule with CHU to conduct a six-hour lecture and provide technical assistance to "get the NCOM model working correctly" on the "Navy base" from November 30, 2016 to December 2, 2016. Additionally, CHU was instructed to bring two forms of Taiwanese identification to enter the Navy base in Kaohsiung. One of the suggested forms of "Taiwan ID" was for CHU to bring his Taiwanese passport.

25. On or about November 20, 2016, CHU received an email via his personal email account from the Taiwanese University Professor pertaining to CHU's work on the "classified" Taiwanese Navy project. The email stated the following:

> Your tentative visit to Navy base will be 11/30-12/02 morning. If you have any schedule conflict, please let me know immediately. I will inform them to change the final schedule. Normally, we do not interact directly with Navy but through [redacted (Chinese characters for Taiwanese Company 1)]. So always a bridge between. Because your role in this project is to help NCOM development, we cannot discuss anything related to NCOM in Taipei, we have to work directly in [sic]

---

[2] Upon initial review of CHU's personal email account, which was obtained pursuant to a search warrant executed on April 22, 2022, CHU received a per diem rate of a 10,000 New Taiwanese Dollars per month, which was paid by the Taiwan University.

Navy base. That's why all of your related work can only be discussed
and conducted inside Navy base. Let's keep in touch!

26.     Your affiant also has reasons to believe that CHU travelled to Taiwan

to participate in the lecture because on December 6, 2016, CHU received an email

from copier1.glerl@noaa.gov [an email address your affiant believes is from a

NOAA multipurpose scanner, which enables CHU to send scanned documents to his

work email]. The attachment to this email was a scan of CHU's boarding pass for

flights from Taipei, Taiwan, to Tokyo, Japan, and from Tokyo to Detroit, both dated

December 5. Additionally, the scan depicts a passport page with a Taiwanese stamp

dated December 5, 2016.   Additionally, records from Delta Airlines verified CHU's

travel from Detroit to Japan on November 24, 2016, and on to Taipei, Taiwan on

November 25, 2016, and return to Detroit from Taipei, via Japan, on December 5,

2016.

27.     From about March 23, 2017, to about March 30, 2017, CHU, and the

Taiwanese University Professor planned CHU's second visit to Kaohsiung on April

6, 2017, to April 7, 2017. Like his previous trip to Taiwan, CHU was told by the

Taiwanese University Professor that his travel expenses to Taiwan would be paid

(by the Taiwan University/Taiwanese Company 1). At CHU's request, the

Taiwanese University Professor provided an invitation letter, which stated CHU was

to visit the Taiwan University from April 1, 2017, to April 10, 2017. Tellingly, the invitation letter did not contain any details regarding his arranged trip to Kaohsiung.

28.     United States Customs and Border Protection (CBP), airline, email and passport records revealed CHU departed from the United States on March 30, 2017, and returned on April 10, 2017.   On or about April 10, 2017, CHU forwarded the scanned image of CHU's boarding pass for flights from Taipei to Tokyo and from Tokyo to Detroit, both dated April 10 and a passport page with a Taiwanese stamp dated April 10, 2017, to his personal email account.

29.     From about October 31, 2017, to about December 15, 2017, CHU, communicated with representatives from Taiwanese Company 1, including Former Taiwanese Navy Official #1, and Taiwanese military personnel, including the Taiwanese Navy Captain. Throughout these communications, CHU planned to participate in a seminar, sponsored by Taiwanese Naval Office 1, which, according to machine translation, was titled "Symposium on Numerical Operational Models of Atmospheric Oceanography." The seminar was stated to be held on December 18, 2017, at a military installation in Kaohsiung, Taiwan. The title of CHU's lecture was "Past, Present and Future of Atmospheric-Ocean Numerical Model Forecasting." All other presenters for this symposium appeared to be from either Taiwanese Naval Office 1 or Taiwanese academic institutions.

30.     On or about November 5, 2017, CHU sent an email to his work account from his personal account. The communication appears to be a Chinese-language abstract for CHU's lecture at the seminar hosted by Taiwanese Naval Office 1. According to a commonly used machine translator, the abstract contains the following sentence: "In addition, the definition of 'operationalization' and the application of atmospheric-ocean numerical models in the navy will be introduced in particular." On or about November 5, 2017, CHU, sent this Chinese-language abstract to Former Taiwanese Navy Official #1.

31.     On or about December 5, 2017, CHU received an email from Former Taiwanese Navy Official #1 in Chinese, which was translated using a commonly used machine translator. Based on the translation, Former Taiwanese Navy Official #1 instructed the seminar presenters to provide their name, birthdate, and identification number. In this communication, Former Taiwanese Navy Official #1 explained the information would be used for a roster at the gate of the military area to expedite entry. On December 5, 2017, CHU replied to Former Taiwanese Navy Official #1 and provided his Chinese name, 朱宜飛, his Taiwanese birthdate, and his Taiwanese identification number.

32.     On or about December 11, 2017, Former Taiwanese Navy Official #1 sent an email to CHU. The communication contained an attachment for the itinerary

for the seminar, hosted by Taiwanese Naval Office 1, to be held on December 18, 2017. Using a commonly used machine translator, the itinerary states the seminar was organized by Taiwanese Naval Office 1 through the Naval Command of the Ministry of National Defense and was held at the Yihai Building.

33.    From open-source research, the Yihai Building is located at a Taiwanese naval base in Kaohsiung, Taiwan. Further, publicly available mapping services identify the naval base and depicts images of a gated area, guarded by armed military personnel. Furthermore, the itinerary sent by Former Taiwanese Navy Official #1 also provided clothing regulations for military personnel and civilians.

34.    On or about December 11, 2017, CHU sent Former Taiwanese Navy Official #1 the PowerPoint presentation for his lecture. CHU's presentation consisted of approximately 35 slides in English and Chinese, which described the use of NCOM and other models for naval applications. As previously described in this affidavit, this was CHU's area of research while employed at NRL for the U.S. Navy.

35.    CBP, email and passport records revealed CHU departed from the United States on December 17, 2017, and returned to from Taipei, Taiwan, on January 9, 2018. On or about January 10, 2018, CHU used his work scanner to copy his boarding pass for a flight from Taipei to Chicago dated January 9, 2018, and a

U.S. passport page with a Taiwanese stamp dated January 9, 2018. On or about January 11, 2018, CHU forwarded the scanned document from his NOAA email account to his personal email account.

36.     On or about January 6, 2018, CHU received an email from an individual in the Chinese language. Through the FBI's investigation, this individual has been identified as a Taiwanese national who collaborates with Taiwanese Company 1 and provided a lecture at the Navy seminar in Kaohsiung on December 18, 2017. Using a commonly used machine translator, the email from this individual stated, "I am very happy to work with you on the Navy's plan" and expressed an interest in continued contact. CHU agreed to meet this individual in Taipei on or about January 8, 2018.

37.     CBP, email, credit card, bank, and passport records revealed CHU has returned to Taiwan on four additional occasions between 2019 to 2021. Notably, CHU departed the U.S. to Taiwan on May 23, 2020, and returned to the U.S. from Taiwan on April 24, 2021. It is important to note that when CHU left the U.S. on May 23, 2020, CHU used a Taiwanese passport. Additionally, CHU continued to be employed at NOAA for the 11-month stay in Taiwan. According to an initial review of CHU's NOAA email account, it appears CHU did not notify his employer of his departure to Taiwan. Indeed, NOAA supervisors told the background investigators

who were investigating CHU's SF-86 application that they believed CHU worked remotely from his residence in Michigan during the 11-month period he was in Taiwan.

<u>CHU's False Statements Regarding His Contacts and Business Relationship with a Taiwanese Company and the Taiwanese Navy</u>

38.    Under "Section 19 – Foreign Contacts" of CHU's SF-86, the form asked, "Do you have or have you had, close and/or continuing contact with a foreign national **within the last seven (7) years** with whom you … are bound by affection, influence, common interests, and/or obligation?" CHU checked "no." However, the FBI's investigation, as previously described, has identified foreign contact with Taiwanese nationals, which is known to have occurred from June 2016 to January 2018, pertaining to his consulting work in Taiwan for Taiwanese Company 1 and the Taiwanese Navy.

39.    In the affidavit CHU signed on January 26, 2022, CHU admitted to only having contact with three Taiwanese foreign nationals, including a personal romantic contact. However, CHU failed to identify any contacts with the Taiwanese University Professor, Former Taiwanese Navy Official #1, Former Taiwanese Navy Official #2, and foreign military personnel, including the Taiwanese Navy Captain.

40.    Under "Section 20B – Foreign Business, Professional Activities, and Foreign Government Contacts" of CHU's SF-86, the form asked a series of

21

questions regarding foreign consulting work and contact with foreign government officials, which are provided below:

> Have you … **in the last seven (7) years** been asked to provide advice or serve as a consultant, even informally, by any foreign government official or agency?

> Has any foreign national **in the last seven (7) years** offered you a job, asked you to work as a consultant, or consider employment with them?

> Have you … **in the last seven (7) years** had any contact with a foreign government, its establishment (such as embassy, consulate, agency, military service, intelligence or security service, etc.) or its representatives, whether inside or outside the U.S.?

CHU checked "no" for each one of these questions in his SF-86. Rather, CHU only disclosed his mandatory foreign military service from July 1985 to July 1987, where he served as a Sergeant in the "Military Dog Center (K9)" for the Taiwanese military in earlier section of his SF-86. CHU was instructed in the SF-86 to not consider this service to answer the above three questions.

41.     In the affidavit CHU signed on January 26, 2022, CHU provided the following written statements:

> I have never had contact with anyone representing a non-U.S. intelligence/security service to include personal meetings, written correspondence, telephonic contact, e-mails, or any other form of communication. Since serving in the Taiwanese military, I have never had contact with anyone representing foreign military to include personal meetings, written correspondence, telephonic contact, e-mails, or any other forms of communication.

I have never been contacted by, and am not in contact with any person known or suspected of being involved or associated with foreign intelligence, terrorist, security, or military organizations.

I have never had any affiliation with a foreign government, military, security, defense industry, or intelligence service other than discussed above.

42.    Although CHU signed a Letter of Intent and agreed to consult for Taiwanese Company 1 and was offered travel reimbursement and stipend from June 2016 to at least January 2018, CHU also swore in his affidavit:

I have not received any money, favors, or gifts by any foreign national or foreign entity as a result of my work.

In the last seven years, I have not applied for employment, entered into any type of employment agreements, or signed a letter of intent to be an employee, contractor, or consultant for a foreign business, foreign government, or any other foreign entity.

In the last seven years, a foreign national has not offered me a job, asked me to work as a consultant, or asked me to consider employment with them. Neither me, nor any members of my immediate family in the last seven years have had any contact with a foreign government, its establishment (such as embassy, consulate, agency, military service, intelligence or security service, etc.) or its representatives, whether inside or outside the United States other than discussed above.

43.    Although CHU travelled to Kaohsiung, Taiwan, to provide a lecture on the implementation of modeling systems in naval operations on a Taiwanese naval base on or about December 18, 2017, in the signed affidavit, CHU also swore:

I have never been invited to be a guest lecturer by any foreign entity. I have never been approached by anyone asking me to work for a foreign entity. I have never represented a foreign interest. No one has ever asked me to provide information, regardless of whether or not officially classified, to a foreign entity/government.

CHU's Failure to Disclose his Dual Citizenship and the Reacquisition of his Taiwanese Passport

44.     Under "Section 10 – Dual/Multiple Citizenship Information" of CHU's SF-86, CHU indicated he was a citizen of Taiwan from "01/1965" to "04/2008" and provided the following statement, "Taiwan citizenship by birth. Born in Taipei, Taiwan in January 1965." CHU indicated he renounced his Taiwanese citizenship and provided the following statement, "Renounced the Taiwan citizenship on 4/2/2008 when became a naturalized US citizen at United States District Court in Columbus, Ohio." When asked if CHU currently held citizenship in Taiwan, CHU marked "No[.]"

45.     Under "Section 10 – Dual/Multiple Citizenship Information" of CHU's SF-86, the form asked, "Have you **EVER** been issued a passport (or identity card for travel) by a country other than the U.S.?" CHU marked "Yes" and identified Taiwanese Passport No. #####0097 with an estimated expiration date of June 14, 2009. Additionally, CHU provided the following statement, "Passport was shredded during previous security clearance investigation in 2008. Foreign Passports Detail –

Traveled Countries Question." Indeed, the FBI's investigation has identified CHU's last use of this passport was on March 30, 2008.

46.     Under "Section 10 – Dual/Multiple Citizenship Information" of CHU's SF-86, the form asked, "Do you have an additional foreign passport (or identity card for travel to report?" CHU marked "no."

47.     In the affidavit CHU signed on January 26, 2022, CHU swore:

> I do not possess any other active passports to include foreign passports from any country including Taiwan. I do not have any other expired passports other than what I have provided. I last held a passport from Taiwan in 2008 and I surrendered it during my security clearance investigation. That passport was shredded. I have not been issued a passport from any other country other than the United States since 2008. I renounced my Taiwanese citizenship and thus am not eligible to reapply for a Taiwanese passport.

48.     Over the course of the FBI's investigation, government records have been obtained which indicate CHU used Taiwanese Passport No. (partially redacted) #####2588.   According to records obtained from CBP, on May 23, 2020, CHU used Taiwanese Passport No. #####2588 to travel on a U.S.-outbound flight from Chicago, Illinois, to Taipei, Taiwan. This was his outbound travel to Taiwan, where CHU failed to notify his employer (NOAA) of his departure for his 11-month stay in Taiwan.

49.     On August 6, 2022, your affiant witnessed a CBP inspection of CHU prior to boarding an outbound flight from Chicago O'Hare International Airport to

Taipei Taoyuan International Airport. During the inspection, your affiant heard the inspecting CBP Officer ask CHU directly if he was a dual citizen of the U.S. and Taiwan. Your affiant heard CHU respond "Yes" to this question. During the CBP inspection, CBP Officers found CHU to be in possession of Taiwanese Passport No. #####2588, which was issued on October 19, 2017. CHU used the Taiwanese passport for his outbound flight.

50.    During the CBP inspection on August 6, 2022, images of Taiwanese Passport No. #####2588 were obtained. The passport was issued to CHU on October 19, 2017, which was approximately two months before his visit to the Taiwanese Navy base on or about December 18, 2017.

51.    Furthermore, FBI has obtained images of physical documents and items pertaining to the benefits CHU received with his Taiwanese citizenship. While in Taiwan from May 2020 to April 2021, CHU possessed a Taiwanese National Healthcare Card and received monthly bills. Furthermore, CHU possessed a Taiwanese National Identification Card.

<u>CHU's Failure to Disclose his Eleven-Month Stay in Taiwan</u>

52.    Under "Section 11 – Where You Have Lived" of CHU's SF-86, the form provided instructions to list all residences beginning with the present residence

and working back 10 years. CHU listed his residence as a specific address in Ypsilanti, Michigan from "05/2017" to "present."

53.    In the affidavit CHU signed on January 26, 2022, CHU provided the following written statements: "I have not maintained a residence for more than thirty days in another country in the last seven years." However, the FBI's investigation, including CBP, email, credit card, bank, and passport records has revealed CHU was in Taiwan from May 23, 2020, to April 24, 2021. CHU failed to disclose the 11-month period he was living in Taiwan.

<u>CHU's Failure to Disclose Foreign Travel</u>

54.    Under "Section 20C – Foreign Travel" of CHU's SF-86, the form asked for CHU to disclose his foreign travel. CHU disclosed travel to Taiwan from "06/2014" to "6/2021 (estimated)" and indicated he took "many short trips" to "visit family or friends."

55.    In the affidavit CHU signed on January 26, 2022, CHU provided the following written statements:

> Other than Canada and the passports stamps listed in my passport I have not traveled anywhere else outside of the United States. I have not traveled anywhere out of the United States since the first case of COVID arrived here. I traveled to Taiwan in 2019 to visit family ... I spent approximately two weeks visiting them in 2019.

56.     There is probable cause to believe this statement was not fully truthful because CHU did not disclose that he had a Taiwanese passport, which he used to travel to Taiwan for 11 months in 2020-2021.

<u>CHU's Failure to Disclose an Email Address and Telephone Numbers</u>

57.     Under "Section 6 – Your Identifying Information" of CHU's SF-86, CHU identified his email address as a specific address at @yahoo.com and his cellular phone number as a United States phone number ending in 4648. In the affidavit CHU signed on January 26, 2022, CHU provided the following written statements:

> I disclosed my current cell phone and do not have an international cell phone or phone accounts. I disclosed the only email that I use. I do not use any other personal email accounts.

However, the FBI's investigation has revealed that CHU has used another personal email account at @gmail.com. Information provided by Google LLC shows that this @gmail.com account is associated with two Taiwanese phones numbers. A review of CHU's financial records indicates recurring payments to Taiwan Mobile Co., Ltd. Initial review of one of CHU's credit card accounts at JP Morgan Chase bank indicated 14 payments were made to Taiwan Mobile Co., Ltd., from December 19, 2020, to January 14, 2022.

28

58. Additionally, initial review of account information provided by Google LLC revealed the Taiwanese mobile phone numbers and two mobile devices have accessed the account. One device was a Chinese branded smartphone (by a company called OPPO) and was registered on December 16, 2020, and the account was last accessed on November 23, 2021. The other device was a Samsung phone registered on October 25, 2020, and the account was last accessed on March 31, 2022.

<u>CHU's Failure to Disclose Foreign Financial Interests</u>

59. Under "Section 20A – Foreign Activities" of CHU's SF-86, the form asked, "Have you …. **EVER** had any foreign financial interests (such as stocks, property, investments, bank accounts, ownership of corporate entities…) in which you … have direct control or direct ownership?" CHU checked "no."

60. Upon review of CHU's electronic accounts, email communications from approximately February 2008 to July 2010 pertaining to CHU's ownership and attempted sale of a condominium in Taiwan were identified. Some of the associated emails and attachments were documents that appear to be sale negotiations, contracts for sale, associated parking spaces, and property deeds. Using an FBI linguist, an identified electronic document appears to be a Taiwanese property deed for the condominium identifying CHU as the owner.

## CONCLUSION

61.     Based on my experience, training, and the totality of circumstances in the above information, there is probable cause to believe that on or about:

a) August 11, 2021, CHU violated 18 U.S.C. § 1001 (false statements) and 18 U.S.C. § 1519 (falsification of records in a federal investigation) in his SF-86;

b) January 26, 2022, CHU violated 18 U.S.C. § 1001 (false statements) during his interview; and

c) January 26, 2022, CHU violated 18 U.S.C. § 1001 (false statements) and 18 U.S.C. § 1519 (falsification of records in a federal investigation) in his affidavit.

WHEREFORE, I respectfully request that the Court issue a criminal complaint and corresponding arrest warrant charging Yifei CHU for violations of 18 U.S.C. § 1001 (false statements) and 18 U.S.C. § 1519 (falsification of records in a federal investigation).

## **REQUEST FOR SEALING**

62.     I further request that the Court order that all papers in support of this application, including the affidavit, complaint, and arrest warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

Respectfully submitted,

Robert Holbrook
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me and/or by reliable electronic means

DAVID R. GRAND
UNITED STATES MAGISTRATE JUDGE

Dated:     October 21, 2022