IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA,

           Plaintiff,

    vs.

YIFEI CHU,

           Defendant.

**Case No.: 0645 2:23 CR 20011 - 001**

## <u>DR. YIFEI CHU'S MEMORANDUM IN AID OF SENTENCING</u>

Dr. Yifei "Philip" Chu ("Dr. Chu"), by and through the undersigned counsel, respectfully submits this Memorandum in Aid of Sentencing and requests a below guidelines sentence of time-served.

## I.   <u>INTRODUCTION</u>

Until October, 2022, Dr. Chu had lived the American dream. Dr. Chu was an immigrant from Taiwan who moved to the United States as a young man to pursue an advanced degree in engineering and had achieved great success. As a result of his hard work, innate intelligence and drive, he enjoyed a rewarding and stimulating government career—first at the Stennis Space Center in Mississippi and, later, at the National Oceanic and Atmospheric Administration ("NOAA"), where he helped develop Great Lakes weather and lake forecasts. Dr. Chu was enormously productive, publishing far more papers than his colleagues or expected of him, and his work was important to society. He was respected by his peers and co-workers. Nearing retirement age, Dr. Chu looked forward to spending time with his grown daughters in the United States and his elderly parents and relatives in Taiwan.

All of this changed in October, 2022, when Dr. Chu was arrested by the FBI and charged with making false statements during his background investigation. Dr. Chu had applied for a "dream job"—a three-year assignment at the Office of Naval Research ("ONR") in Singapore as the Science Director. Dr. Chu was eminently qualified for the position and, in addition, living in Singapore would enable him to much more easily visit his elderly and infirm parents in Taiwan.

In the course of completing his background investigation, Dr. Chu deliberately failed to report a number of contacts he had had in recent years with Taiwanese nationals. Although these contacts were entirely lawful, Dr. Chu was concerned that, if reported, his background investigation would likely be delayed for many months, thereby delaying the start of his position in Singapore.

Dr. Chu's misrepresentations were almost immediately identified, and he was arrested. The government successfully moved for pre-trial detention and Dr. Chu spent nearly four months at the Sanilac County Detention Center where he was held under extremely harsh conditions. Since his release in mid-February, Dr. Chu was required to spend the next three and one-half months under strict home confinement, required to wear an ankle bracelet and to obtain permission from a supervisory probation officer before he could leave his home for any reason.[1] Even since the Court modified Dr. Chu's conditions of confinement, he has still been required to wear a GPS monitor, have a curfew, cannot travel outside the Eastern District of Michigan, and cannot stay overnight outside of his home.

Dr. Chu has now pled guilty to two felonies, meaning his once flourishing career and reputation are now in tatters.

---

[1] On May 22, 2023 the Court granted Dr. Chu's motion to modify his bond conditions to permit him to leave his home during the day without pre-approval.

For the reasons outlined below, a below-guidelines sentence of time-served is sufficient but "not greater than necessary to accomplish the sentencing goals advanced in § 3553(a)(2)." *Kimbrough v. United States*, 552 U.S. 85, 111 (2007).

## II.   BACKGROUND

### A.   Dr. Chu's Early Life and Education

Dr. Chu was born in 1965 in Taipei, Taiwan. Dr. Chu, along with his two younger brothers, were raised in the countryside outside of Taipei city. His parents were both extremely hard-working—his father fled to Taiwan from mainland China in 1949 when he was only 14 years-old and then put himself through school, eventually becoming an engineer—and that work ethic was passed along to Dr. Chu.

Dr. Chu and his two brothers shared a bedroom in their tiny apartment. Living in the remote countryside meant that Dr. Chu had to commute long distances to his school in the city. From the time he was in elementary school and continuing through high school, Dr. Chu spent five hours per day commuting by bus to and from school every day. Dr. Chu would wake at 5:00 a.m., leave home at 5:30 a.m., and not return home until after 7:30 p.m.

Despite the long commute, Dr. Chu was able to earn good grades, and was admitted to the National Taipei Institute of Technology ("NTIT") to study Civil Engineering. NTIT was the top technical university in Taiwan, where only the top one per-cent of students were admitted. Dr. Chu worked a variety of odd-jobs during his summer breaks in order to pay for his tuition and he graduated with a bachelor science degree from NTIT in 1985.

### B.   The American Dream and Dr. Chu's Advanced Graduate Study in the US

While at NTIT, Dr. Chu often heard professors discuss their experience studying and living in the United States. Dr. Chu was intrigued and made up his mind to pursue an advanced degree

3

in the United States. In 1987, after he completed his two-year mandatory military service, Dr. Chu came to the United States to pursue graduate study in the Civil Engineering Department at Ohio State University in Columbus where, in 1989, he received a master's degree and then elected to continue into a PhD program in the same department. In 1998, Dr. Chu received his PhD degree in Civil and Environmental Engineering with two minor degrees in Atmospheric Sciences and Geography Departments.

###    C.    Family Life

Dr. Chu was married in January 1990 and his first daughter, Andrea, was born later that year. A second daughter, Jaclyn, was born in 1996. Because the stipend and scholarship offered while working on his PhD degree was not enough to support his family, for many years Dr. Chu chauffeured for a disabled attorney and delivered takeout food orders in the evenings and on weekends to help make ends meet. Dr. Chu divorced in 2009 and remained a dedicated and loving father to his two daughters, and has a close relationship with them both.

###    D.    Dr. Chu's Academic and Federal Service Research Career

Although Dr. Chu received multiple offers for professorships after he received his PhD, he decided to stay at Ohio State to minimize the disruption that moving his young family would cause. Dr. Chu continued his scientific research in the Great Lakes region, and taught senior and graduate level courses in fluid mechanics, open channel hydraulics and hydrology.

In 2001, Dr. Chu and a team of his colleagues were honored with a special award from the American Meteorological Society "for developing the first U.S. coastal forecasting system to make routine operational predictions of currents, temperatures, and key trace constituents" in the Great

Lakes system.[2] Dr. Chu's played an instrumental role in developing a better method to calculate lake temperature predictions. This research greatly benefitted residents of the Great Lakes Region as it provided a more accurate prediction of weather and lake conditions for commercial shipping, recreational fishing, tourism, and other industries, and also helped to predict unsafe weather conditions, such as storms and flooding.

In 2008, Dr. Chu became a naturalized United State Citizen and joined the Naval Research Laboratory ("NRL") at the Stennis Space Center in Southern Mississippi as a research oceanographer. As a research oceanographer, Dr. Chu conducted fundamental research in ocean sciences. He developed an atmosphere-ocean-wave forecast model, which was able to take in weather data as input, and produce sea levels, ocean temperature, wave and current data as output. All of this data was then made available for the general public. Dr. Chu's research at NRL was published in scientific journals, technical reports and presented at national and international conferences and meetings, such as at the American Meteorological Society ("AMS") annual meeting and the American Geophysical Union's ("AGU") Ocean Sciences meetings. Dr. Chu has never worked on classified, confidential or sensitive projects. All of his research was for publication to further advance science.

During the eight years Dr. Chu worked at NRL in Mississippi, his family remained in Columbus since his daughters were settled in the high school and elementary school systems in Ohio. Instead, Dr. Chu routinely made the 16-hour, 1000 mile trip from Stennis Space Center, Mississippi to Columbus, Ohio during long weekends and holidays to visit his daughters in Ohio.

---

[2] Ex. A.  ]

In 2013 Dr. Chu applied to Tulane University's weekend Executive MBA program to enhance his management and business knowledge. He was awarded the only scholarship in the class and earned an EMBA degree in 2014.

In 2015, Dr. Chu returned to the Midwest and joined the NOAA Great Lakes Environmental Research Laboratory in Ann Arbor as a supervisory physical scientist and branch chief. In addition to leading a research branch with ten federal scientists, Dr. Chu conducted innovative research related to the Great Lakes, where he developed new methods to test and predict the Great Lakes water levels, temperatures, currents, ice, lake effect snow and flooding forecasts. This research and the data it generated benefitted the entire Great Lakes community, including commercial shipping, navigation, boating, and fishing. This research also helped to develop warnings for lake effect snow storms, lake ice and potential flooding events. All of this information and research was disseminated to the general public via the NOAA website.[3]

### E.    Professional Accomplishments and Awards

For more than two decades, Dr. Chu has been an internationally recognized, award-winning scientist in the field of oceanography. In that time frame, he has published more than eighty scientific articles and made more than a hundred scientific presentations. In a typical year, Dr. Chu published five to seven scientific articles and gave an average of eight to ten scientific presentations or invited speeches. This was a remarkable output, particularly since NOAA only

---

[3] Any suggestion that NOAA research is in any fashion closely held is contradicted by NOAA's Mission Statement: "To understand and predict changes in climate, weather, ocean and coasts; *to share that knowledge and information with others*; and to conserve and manage coastal and marine ecosystems and resources." https://www.noaa.gov/our-mission-and-vision#:~:text=NOAA's%20mission%20is%20to%20understand,America's%20coastal%20and%20marine%20resources (emphasis added).

expected its scientists to publish two articles and give one presentation per year. Dr. Chu's annual output far surpassed that of his NOAA colleagues.

At NOAA, Dr. Chu's innovative research and accomplishments were recognized with several major awards: in 2021, he won the Department of Commerce Bronze Medal Award "for improving lake effect snow and ice forecasts through rapid transition of an innovative coupling of weather and coastal hydrodynamic models." Also in 2021, Dr. Chu co-authored an article that won NOAA's outstanding publication award for "improvement for lake-effect snow using a one-way, air-lake model coupling approach," published in the Journal of Hydrometeorology.[4] Dr. Chu was awarded three contribution awards, two invention awards and one patent during his tenures at NRL.[5]

All the ocean research that Dr. Chu has conducted in the past 25 years has been fundamental research,[6] mainly devoted to improving the forecasts of the Great Lakes climate, water levels, temperature, wave, ice, and harmful algal blooms in order to save lives and reduce coastal flood damages. Dr. Chu had never worked on any classified projects and every presentation

---

[4] https://gsl.noaa.gov/news-media/news/2021-noaa-research-outstanding-publication-award

[5] In 2014, the U.S. Patent and Trademark Office issued a patent for his innovative and novel invention for "An automatic method and system for predicting high resolution tidal heights and currents in coastal and estuarine zones."

[6] Fundamental research, refers to research whose purpose is to explore knowledge and ideas, as opposed to solving a particular problem or answering a specific question; it is often referred to as "knowledge for knowledge's sake." "Basic (aka fundamental or pure) research is driven by a scientist's curiosity or interest in a scientific question. The main motivation is to expand man's knowledge, not to create or invent something. There is no obvious commercial value to the discoveries that result from basic research. Applied research is designed to solve practical problems of the modern world, rather than to acquire knowledge for knowledge's sake. One might say that the goal of the applied scientist is to improve the human condition. For example, applied researchers may investigate ways to: improve agricultural crop production; treat or cure a specific disease; improve the energy efficiency of homes, offices, or modes of transportation." https://www.sjsu.edu/people/fred.prochaska/courses/ScWk170/s0/Basic-vs.-Applied-Research.pdf

or speech he has given was based on publicly available journal articles. Almost all of the results of Dr. Chu's research is publicly available via scientific articles, government websites, or public presentations.

### F.      Dr. Chu's Charitable and Community Service

From 2010 to 2019, Dr. Chu mentored minority, under-privileged summer fellow students with a science focused research project every summer through a ten-week program at both NRL and the NOAA research laboratory where Dr. Chu worked. The students were admitted to the program with no cost to them, and Dr. Chu volunteered his time to mentor the fellows. In addition, over the past seven years, he co-advised and served on thesis/dissertation committees for a dozen PhD students, and as adjunct faculty at seven universities.[7] Dr. Chu was not paid for this time, which involved meeting with the students to discuss their research ideas, offer advice, and then review and comment on their thesis/dissertation, and attend the thesis/dissertation defense.

Dr. Chu is a passionate and dedicated person who cares about his community. He is a long-time volunteer of Tzu Chi foundation, an international non-profit charity organization. In March 2020, at the outset of the COVID-19, Dr. Chu personally delivered 80,000 surgical and KN95 masks, face masks, and personal protective equipment (PPE) to major hospitals (Beaumont, St. Johns, Henry Ford and UM hospital), dozens of medical clinics, and nursing homes in Detroit and Southeast Michigan. All the masks and PPE equipment were donated by Tzu Chi members and volunteers, and were purchased by the Tzu Chi Foundation Midwest headquarters in Chicago. Dr. Chu drove a U-Haul truck for eight hours straight to Chicago, loaded all the masks and PPE, and

---

[7] Ohio State University, Michigan Technological University, Tulane University, University of Michigan, University of Maryland, University of Wisconsin and Swiss Federal Institute of Technology.

drove straight back to Michigan to deliver these critically needed medical equipment to various hospitals and medical clinics. Dr. Chu risked his own life to deliver critically needed masks to staff in these medical facilities so they would have proper equipment to protect themselves. The CEO, president, and VPs in Beaumont Hospital signed a thank you card to Dr. Chu for his brave and generous effort. Ex. B.

In addition to providing masks and PPE to various medical facilities in Michigan, Dr. Chu also donated cash and his time to disaster relief efforts. There were several severe floods and tornados in the past few years that devastated residents in Detroit and Michigan. Dr. Chu was actively involved in several of the disaster relief efforts. From 2017-2019, Dr. Chu participated in disaster relief distribution effort to flood victims in Midland City and Isabella County. In 2021, Dr. Chu donated $5,000 of his own money to the foundation and participated in the disaster relief effort to distribute cash cards, blankets, clothing, power washers, and cleaning supplies to the residents impacted by the flood events in Detroit, Dearborn Heights, and Allen Park. He received a thank you email from Governor's office thanking his generosity and volunteering effort. Ex. C.

During Christmas, 2021, Dr. Chu drove more than 1200 miles round trip to Mayfield, Kentucky to assist the residents impacted by the EF-4 tornado. This was also a Tzu Chi foundation organized disaster relief effort where Dr. Chu was a long-time volunteer. Last July, when Gaylord, Michigan was hit by a serious tornado, Dr. Chu again joined a Tzu Chi disaster relief team and drove to Gaylord and distributed cash cards, blankets, clothing, food and supplies to more than 100 families impacted by the devastating tornado.

Dr. Chu's commitment and passionate volunteer actions for other residents of Michigan were truly remarkable. His selfless volunteer spirit demonstrates his compassion for others in his community and is nothing short of extraordinary.

9

III.     **OFFENSE CONDUCT**

A.     **Dr. Chu Seeks New Job as Office of Naval Research Science Director Detail in Singapore.**

Dr. Chu left Taiwan at the age of 22 to pursue his American dream, and worked tremendously hard for the next 36 years. Although he had accomplished a great deal academically and professionally, he also felt guilt that he was not a good son to his elderly parents. Taiwanese culture puts great emphasis on the need to honor and care of one's parents, and this responsibility was highest on Dr. Chu, as the eldest son. Both of his parents suffered with serious health conditions. Dr. Chu's 88 year-old father has late stage prostate cancer, Parkinson disease, and suffers from depression and dementia, and is mostly confined to a wheel-chair. His mother is 84 years old and also suffers from dementia and has had several major surgeries.

In late 2021, Dr. Chu learned that the ONR Global was recruiting for Science Director. This position would be stationed in Singapore and be responsible for scientific collaboration between the US Navy and academic research institutions in Singapore, Taiwan, Malaysia and other Asian countries. The Science Director was to serve as a liaison scientist to bridge NRL scientists and Taiwan academia and military to establish and strengthen international scientific collaboration and research projects. The position was a three-year temporary detail assignment post at the US embassy in Singapore.

Dr. Chu saw this as an incredible opportunity for him. Not only was he highly qualified for the job, the position would permit Dr. Chu to travel to Taiwan to visit his parents more frequently, and on short notice in case of emergency. Dr. Chu applied for and was soon selected for the

position. But before he could be officially begin the job, Dr. Chu was required to complete a routine background investigation.[8]

### B.      Dr. Chu's Unreported Contacts with Taiwanese Nationals

In 2014, while Dr. Chu was working as an NRL research oceanographer at the Stennis Space Center in Southern Mississippi, he met Alec Wu, a Taiwanese naval officer who was on official training at the US Naval base in Gulfport. This meeting was social and unplanned; they both had been invited to lunch at the home of an NRL scientist. Dr. Chu was unaware when Mr. Wu completed his training or left Mississippi, and the two men did not stay in touch. Several years later, Dr. Chu was reacquainted with Mr. Wu when introduced by NTU professor Yu-heng Tseng in Taiwan in 2016.

Dr. Chu had met NTU Professor Tseng in 2015 at a NOAA research laboratory in Boulder, Colorado, where Dr. Tseng was a visiting scientist. Dr. Chu ran into Dr. Tseng and they chatted, exchanged names, and talked about their research for several minutes. About a year later, in 2016, Professor Tseng invited Dr. Chu to collaborate on a project on which he was the project lead. The project was funded by Mercuries Data System ("MDS"), a publicly traded Taiwanese company that provides computer system integration services. MDS had a contract to upgrade the Taiwanese Navy's computer system and funded Professor Tseng to provide education and training on meteorological and oceanographic models. The proposed project involved Professor Tseng giving lectures and training in his areas of expertise in atmospheric and meteorology. Dr. Chu's proposed role was to provide a single lecture and a speech. All told, the engagement would involve approximately three days of work.

---

[8] This background investigation was required because the job was located at the U.S. Embassy.

Dr. Chu visited the Kaohsiung Naval base on one occasion in December 2016, and once each in April and December 2017 in connection with his lecture. At the December, 2016 visit, Dr. Chu and Professor Tseng met the Navy meteorology and oceanography director for about 30 minutes. The director talked about an upcoming Navy computer upgrade plan, and discussed the potential date and schedule of Drs. Tseng and Chu's proposed April, 2017 lecture. The director also gave Professor Tseng and Dr. Chu a tour of the building.

In his April, 2017 visit to the Naval base, Dr. Chu gave a lecture on basic oceanography and ocean models. The lecture was described "as a very general and high-level overview of various ocean models." The audience included NTU Professor Tseng, other weather, ocean, wave modelers and MDS computer scientists working on the computer upgrade project.[9]

During a third and final visit, in December, 2017, Dr. Chu gave an invited speech "The Past, Present and Future of Ocean Modeling" at a public symposium and attended the same one day symposium at the naval base where the agenda covered ocean, typhoon and atmospheric modeling generally.

Dr. Chu was not paid for these activities, but was reimbursed a total of $3,300 to defray a portion of his travel expenses for all three trips. He took annual leave on all three occasions and, after spending a single day at the naval base each visit, he spent the rest of his leave with his parents in Taipei.

In December, 2015, Dr. Chu signed a letter of intent with MDS. Ex. D The body of the letter was all of five lines long and simply stated that MDS was "to work on Navy Meteorology

---

[9] The lecture was based on a paper published a dozen years earlier, in 2005—"Formulation, implementation and examination of vertical coordinate choices in the Global Navy Coastal Ocean Model (NCOM)" in the Journal of Ocean Modelling.

and Oceanography office high speed numerical model computing system project" and that Dr. Chu would provide "project related atmospheric numerical model research [and] professional advice and service suggestions." There was no formal agreement, no scope of work, no time commitment, and no compensation mentioned. Dr. Chu ultimately never signed any contract with MDS or the Taiwanese military, and nothing further came of this proposal. Dr. Chu had no further contact with Professor Tseng, anyone from MDS, or any Taiwanese military personnel after he delivered his talk in December, 2017.

No non-public information was ever disclosed by Dr. Chu during any of his interactions with any of the Taiwanese nationals described above. Indeed, Dr. Chu could not have revealed any sensitive or classified material even if he had wanted to because he did not possess any: in Dr. Chu's 14 years of federal service as a scientist—seven years at NRL and seven years at NOAA—he never worked on any classified project or had access to classified information.

The December, 2017 seminar at the Taiwan Naval base was the last time Dr. Chu had any contact with NTU, the consulting firm or anyone in the Taiwanese military. All of Dr. Chu's trips to Taiwan after December, 2017 were for personal reasons—visits made to see visit his parents, relatives and his girlfriend.

### C.      The Background Investigation

Before he could be formally offered the position of Science Director in Singapore, Dr. Chu had to complete a background investigation and fill out a form SF-86. During the course of this investigation, Dr. Chu was asked a series of questions about his contacts with foreign nationals in which he failed to report the contacts noted above. For example, when asked, he represented that "he had never been invited to be a guest lecturer by any foreign entity" and that he had "never been approached by anyone asking me to work for a foreign entity." He also stated that since working

in the Taiwanese military, he "never had contact with anyone representing foreign military to include personal meetings, written correspondence, telephonic contact, e-mails, or any other forms of communication." Dr. Chu also denied having provided "advice or support to any individual associated with a foreign business or other foreign organization that [he had] not previously listed as a former employer."

Further, Dr. Chu claimed that he had not "received any money" from any "foreign national or foreign entity as a result of [his] work"—even though he had received reimbursement for his travel expenses—and that he had not, within the previous seven years, "applied for employment, entered into any type of employment agreements, or signed a letter of intent to be an employee [ ] for a foreign business, foreign government or any foreign entity," and further denied that he had been "asked [ ] to consider employment" by a foreign national.

These assertions were false. Although all of Dr. Chu's contacts with Taiwanese officials were entirely lawful, if reported they would have necessitated a far lengthier and more complicated background investigation. Because Dr. Chu could not begin work at the Embassy in Singapore without the investigation successfully completed, it meant there would likely be a very lengthy delay in his start date. At the same time, Dr. Chu's furniture, clothing and household belongings had already been shipped to Singapore in January 2022, and has been stored in a Singapore port storage facility for more than a year. Instead of exercising patience, Dr. Chu made the horrifically bad decision to simply deny that these contacts occurred—despite the plethora of readily available evidence that contradicted his denials.

Dr. Chu failed to disclose a lecture and speeches concerning years'-old, publicly available research about the past, present, and future of ocean modeling. All of the materials presented were based on publicly available information and the intended audience was at the college freshmen

level. The workshop was open registration with no restrictions and the audience included faculty, researchers, and students from three nearby universities. Other speakers in the workshop included other NOAA scientists and university professors and researchers. The letter of intent, although signed, never led to a formal contract and no money was exchanged with MDS.

The decision by Dr. Chu to deny these contacts with Taiwanese nationals was catastrophically foolish. Because of his short-sighted desire to secure the position he coveted in Singapore as soon as possible, he sabotaged his career and his future. This decision led to his arrest, his detention for nearly four months in a county detention facility, and two felony convictions. Dr. Chu's stellar career and reputation have been single-handedly destroyed by his own poor judgment and choices.

### D.    Dr. Chu's Arrest and Plea

#### i.    Three and Half Months Detained in Sanilac County Jail

Dr. Chu was preventively detained from the time of his arrest on October 24, 2022 until this Court granted his release on February 8, 2023, a period of three and one-half months. During this 107 days, Dr. Chu was locked in a maximum security ward with 25 men charged with criminal sexual conduct. He was locked in his 7' by 10' cell with a cell mate for 19 hours every day and given extremely limited exercise time consisting of no more than a walk around the pod. He was allowed out of his cell for only five hours per day to walk around, shower and make phone calls. When locked in his cell, no television or radio were permitted. He was only allowed three books. For 19 out of 24 hours per day, all Dr. Chu was permitted to do was sleep, eat, pray and read his three allowed books.

During his detention, not only was Dr. Chu never permitted to step outside in the fresh air, he never saw a window and never saw daylight. Nor was he permitted any visits from family. In

early December, Dr. Chu fainted due to low blood pressure and low blood sugar and suffered head and neck injuries when he fell to the floor. Dr. Chu was rushed to the local emergency room for examination and treatments. In addition, while detained Dr. Chu developed a serious tooth infection that will now require a root canal but was simply treated with Tylenol every day for three months to manage the pain. The worst part of this terrible experience for Dr. Chu was that he was sexually harassed by other inmates in his ward.

### ii.     Home Detention

On February 6, 2023, the Court granted Dr. Chu motion for release of pre-trial detention and was ordered to be on strict home detention. For the next three and one-half months, he was required to wear a GPS monitor on his ankle and could not leave his home without pre-approval from his supervisory probation officer. During this period of home detention, Dr. Chu was required to remain inside his residence except for trips to do grocery shopping, religious and community services or medical appointments.[10] He had had no reported violations during this period.

On May 23, the Court modified these conditions such that Dr. Chu was permitted to leave his home during the day without pre-approval. Nevertheless, Dr. Chu has still been required to wear a GPS monitor at all times, has a curfew, and cannot travel outside the Eastern District of Michigan.

All told, Dr. Chu has had his liberty severely restricted since his arrest in October, 2022, 10 months ago.

---

[10] On May 22, 2023 this Court granted Dr. Chu motion to relax the conditions of his confinement.

### iii.     Impact of Arrest and Conviction

When the news of Dr. Chu's arrest reached Taiwan, his parents, brother, extended family members and relatives were devastated. Particularly distressing were the news stories that portrayed him as a spy who worked for a foreign government.

Dr. Chu has lost his job and his professional reputation is in ruins. His job opportunities, which had been extremely bright, are, for the most part, foreclosed because of these convictions.

Dr. Chu has already paid an enormous price for his conduct. He is unemployed with few prospects and his professional reputation has been ruined forever. As a convicted felon, his potential job opportunities will be very limited. He can no longer work for a federal research laboratory, and it is exceedingly unlikely any university will hire Dr. Chu as a professor.

Dr. Chu has already drained most of his life savings to pay for his legal defense. He has had to borrow money from his brother and aunt to pay for the legal bills and to pay his day-to-day bills. It is very likely he has to sell his house in order to pay back these loans.

## IV.    LEGAL ARGUMENT

### A.     The Guidelines are Advisory, and the Sentence Should be No Greater than Necessary to Satisfy the Statutory Purposes Under § 3553(a).

At the outset of sentencing, the Court must determine the applicable Sentencing Guidelines range. *See Molina-Martinez v. United States*, 136 S. Ct. 1338, 1342 (2016). Although the Guidelines were once mandatory, following *United States v. Booker*, 543 U.S. 220 (2005), the Guidelines no longer carry the force of law, federal judges are no longer bound to strictly apply them, and "[a] district court may not presume that a Guidelines sentence is reasonable." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc). The Guidelines are now purely advisory, and the Court has significant discretion to vary from the Guideline range. *See id.* at 187–88. Instead of applying the Guidelines as compulsory, the Court has discretion to impose a non-

Guideline sentence as long as the sentence is reasonable and justified. *See United States v. Jimenez-Beltre*, 440 F.3d 514, 518 (1st Cir. 2006) (en banc) ("*Booker*'s remedial solution makes it possible for courts to impose non-guideline sentences that override the guidelines, subject only to the ultimate requirement of reasonableness."), *abrogated on other grounds by Rita v. United States*, 551 U.S. 338 (2007); *see also Koon v. United States*, 518 U.S. 81, 96–97 (1996) (determining that a district court is vested with broad discretion to depart from the Guidelines); U.S.S.G §5K2.0 (2018).

The Guidelines are now but a "starting point and initial benchmark" for sentencing. *Gall v. United States*, 552 U.S. 38, 39 (2007). After calculating the Guidelines range, the Court must then "make an individualized assessment based on the facts presented" by the parties. *Id.* Post-*Booker* sentencing involves two steps. After the first step of calculating the Guideline range, the Court must then engage in the second step of considering the § 3553(a) factors to determine a reasonable sentence. *See United States v. Talley*, 431 F.3d 784, 786 (11th Cir. 2005), *abrogated on other grounds by Rita*, 551 U.S. at 338; *United States v. Hung*, 459 F.3d 1180, 1185 (11th Cir. 2006). Just as the Court has discretion to impose a non-Guidelines sentence, "the weight to be afforded any § 3553(a) factor is a matter firmly committed to the discretion of the sentencing judge." *United States v. Verkhoglyad*, 516 F.3d 122, 131 (2d Cir. 2008) (internal quotation marks omitted). Furthermore, the Court has discretion to decide whether any § 3553(a) factor justifies a downward variance. *See Gall*, 552 U.S. at 51. When imposing a sentence outside the Guidelines range, the Court applies a non-mathematical formula with individualized assessments based on facts presented by the parties. *Id.* at 47, 50.

This Court must be guided by the fact that the ultimate sentence should be "not greater than necessary to accomplish the sentencing goals advanced in § 3553(a)(2)." *Kimbrough*, 552 U.S. at 111.

> **B.    A Sentence of Time-served is Appropriate in Light of Dr. Chu 's Personal History and Characteristics (§ 3553(a)(1)).**

Dr. Chu has already received a stiff punishment for his conduct. He spent over 100 days under extremely harsh conditions at the Sanilac County jail, which was not properly equipped to handle an inmate like Dr. Chu. Because of Dr. Chu's unique characteristics—his age; his East Asian ethnicity; the nature of his charges—press reports incorrectly labelled him a Chinese spy; and his complete lack of any criminal history, he was a particularly vulnerable inmate for whom pre-trial detention was often terrifying. In addition, he was housed in a wing of the jail that contained sex offenders, and he was threatened with physical violence by other inmates. Dr. Chu was confined to a tiny cell, which he shared with a cellmate, 19 hours per day. During that time he had no television, radio or internet to divert him or help him spend the time. He was permitted only three books. He never saw daylight even through a window for the entire length of his confinement.

While the conditions that Dr. Chu experienced while confined may not have been "so out of the ordinary that they constitute an independent basis for a downward variance," *See United States v. Roser*, 529 F. App'x 450, 453 (6th Cir. 2013) ("[W]e acknowledge that 'presentence confinement conditions may in appropriate cases be a permissible basis for downward departures . . . .'"); *United States v. Carty*, 264 F.3d 191, 196 (2d. Cir. 2001) ("The Sentencing Commission has not categorically proscribed consideration of this factor, and we cannot say that conditions of pre-sentence confinement may not be so severe as to take a particular case 'outside the heartland

of the applicable Guideline.'"), these conditions clearly constituted a severe punishment that has already been imposed on Dr. Chu.

In addition, Dr. Chu's conditions of release for three and one-half months after his release from pre-trial detention were maximally restrictive. Dr. Chu was on what was, effectively, house arrest, with a an electronic monitor that he was never permitted to remove. He could not leave his house without permission from probation and only for approved purposes, such as grocery shopping or doctor's visits. As a result, by the time of sentencing, Dr. Chu has had his liberty severely restricted for nine and one-half months.

Dr. Chu has led a remarkable life. Born into poverty in rural Taiwan, through incredibly hard work and commitment, he graduated with honors from Ohio State University and was an internationally recognized expert in the field of oceanography, and was a mentor to dozens of graduates with doctoral or Master's degrees at OSU, MTU, University of Michigan, University of Maryland, Tulane University and Swiss Federal Institute of Technology. As the letters from his family and colleagues all note, Ex. E, he is a uniquely talented and productive scientist, one who combines tremendous drive with remarkable humility and modesty about his own achievements.

He has never been in trouble of any kind at any prior point in his life. Those who have known Dr. Chu best know him to be a good and decent man, a devoted father, and a mentor to other young scientists and engineers. He made a horrendously bad decision that has entirely upended his life and has already paid enormous consequences. But he poses no threat to society, and he is not a danger to reoffend. For these and the reasons listed below, a sentence of time-served is appropriate.

The sterling reputation Dr. Chu spent decades building is no more. His finances are teetering on the brink. His two daughters have lived in fear of losing their father to a lengthy prison

sentence. Dr. Chu bears the guilt of causing a tremendous burden on both of his daughters, who have taken large periods of time away from their jobs to help their father with his living situation. The stress the family has lived under since October last year has been almost too much for them to bear.

The devastating impact of this conviction is wide-ranging. The notoriety and opprobrium associated with a criminal conviction of this nature for a scientist means that Dr. Chu is unlikely to be able to work as a federal researcher or university professor again. The life he once had is over. And that is the case regardless of the sentence ultimately imposed. These consequences, too, are a form of punishment. *See, e.g.*, *United States v. Anderson*, 533 F.3d 623, 633 (8th Cir. 2008) (upholding below-Guidelines sentence in part because district court found that "defendant had suffered atypical punishment such as the loss of his reputation and his company"); *United States v. Anderson*, 267 F. App'x 847, 850 (11th Cir. 2008) (affirming a below-Guidelines sentence in part because defendant suffered loss to his professional reputation and lost his high-paying job); *United States v. Jasen*, 15-CR-00214, (M.D. Fla. Jan. 28, 2016), ECF No. 86 at pp. 53-54 (imposing probation because, in part, "one who makes a mistake in judgment…should be, in my judgment, absent other aggravating circumstances, be able to go on with their life and suffer the humiliating and devastating effects of being prosecuted…which will… harm your reputation, your social status…"); *United States v. Malik*, 424 F. App'x 122, 127 (3d Cir. 2011) (affirming a below-Guidelines sentence in part because the defendant "was punished by the reputational harm he suffered as a result of the criminal action"); *United States v. Redemann*, 295 F. Supp. 2d 887, 894–97 (E.D. Wis. 2003) (downward departure warranted where defendant suffered serious collateral consequences from conviction); *United States v. Samaras*, 390 F. Supp. 2d 805, 809 (E.D. Wis. 2005) (imposing below-Guideline sentence in part because, "as a consequence of his conviction

and sentence, defendant lost a good public-sector job, a factor not considered by the Guidelines."); *United States v. Anghaie*, 09-CR-0037 (N.D. Fla. Nov. 29, 2011), ECF No. 238 (imposing below-Guidelines sentence and noting that defendants "received significant punishment through financial loss, loss to reputation and career opportunities."); *United States v. Vigil*, 476 F. Supp. 2d 1231, 1315 (D.N.M. 2007) (in considering justness of sentence, "it is important to consider all other forms of punishment [defendant] has already suffered," including loss of job and damage to his personal and professional reputation); *United States v. Olis*, Criminal No. H-03-217-01, 2006 WL 2716048, at *13 (S.D. Tex. Sept. 22, 2006) (substantial variance warranted in part because "the attendant negative publicity, the loss of his job and accounting and law licenses, and the need to provide support for his family will provide adequate deterrence against any potential future criminal conduct.").

### C. A Non-custodial Sentence Affords Adequate Deterrence to Federal Employees who are Tempted to Make Misrepresentations During a Background Investigation.

It seems inconceivable that other federal scientists, or employees, would intentionally fail to correctly fill out the background investigation form even if Dr. Chu receives a sentence of time-served. Being branded a felon, facing the prospect of prison, losing one's career and reputation is more than adequate deterrence. No federal employee or scientist would consider these consequences and believe that falsely filling out a background investigation form was worth this type of risk. Any rational being would be deterred by these consequences. (And irrational actors cannot, by definition, be deterred, as they will not consider the consequences of their conduct.) Thus, this factor does not support a custodial sentence.

**D.      A Non-custodial Sentence is Warranted because Dr. Chu Poses No Threat to the Public (§ 3553(a)(2)(C)).**

With the exception of the present criminal proceeding, Dr. Chu has never been accused of wrongdoing. As such, nothing in his past suggests any criminal tendencies. There is no legitimate risk of recidivism. Thus, this factor does not support a custodial sentence.

**E.      A Non-custodial Sentence is Warranted because Dr. Chu Requires No Correctional Treatment (§ 3553(a)(2)(D)).**

Dr. Chu does not require any educational or vocational training, medical care, or other correctional treatment that would warrant a custodial sentence, let alone one within the Guidelines range. This supports a sentence without incarceration.

**V.      <u>CONCLUSION</u>**

Dr. Chu not only has no criminal history; he has no prior *arrests*. There can be no serious suggestion that Dr. Chu is at risk to re-offend. A sentence of time-served, or probation, is appropriate and justified. Such a sentence would be no "slap on the wrist": the life that Dr. Chu knew prior to his arrest is over, forever. He was convicted of a felony—a label that he will be forced to wear for the rest of his life. He and his family have already endured great psychological trauma since last October, with everlasting consequences for all of them. His family is on the brink of bankruptcy. No pecuniary harm resulted from Dr. Chu's conduct. In the circumstances of this case, a sentence of time served, or probation, is sufficient to satisfy the statutory purposes of sentencing.

Dated: August 1, 2023                    Respectfully submitted,

                                         */s/ Peter R. Zeidenberg*

                                         Peter R. Zeidenberg (*pro hac vice*)
                                         ArentFox Schiff LLP
                                         1717 K St NW
                                         Washington, DC 20006
                                         Peter.zeidenberg@afslaw.com
                                         Tel: 202-857-6000
                                         Fax: 202-857-6395

                                         Jamil K. Khuja (P71963)
                                         Khuja Law Firm, P.L.L.C.
                                         1360 Porter St.
                                         Suite 200
                                         Dearborn, MI 48124
                                         khujalaw@gmail.com
                                         Tel: 313-263-3353
                                         Fax: 313-945-0103

                                         *Attorneys for Defendant*

<u>**CERTIFICATE OF SERVICE**</u>

    I HEREBY CERTIFY that on August 1, 2023, a true and correct copy of the foregoing

has been electronically filed with the Court and served to all counsel of record via CM/ECF.


                                                        */s/ Peter R. Zeidenberg*
                                                        Peter R. Zeidenberg