UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

           Plaintiff,                    Criminal No. 23-CR-20011

v.

                                           Hon.  Victoria A. Roberts

YIFEI CHU,
      aka "Philip Chu"

           Defendant.
_____ /

**_GOVERNEMENT'S SENTENCING MEMORANDUM_**

The United States of America, by and through undersigned counsel, provides this memorandum to inform the Court of the government's position at sentencing. The defendant, Yifei Chu, repeatedly lied and made false statements to the United States government about his work on behalf of a foreign country's navy – all to obtain a U.S. security clearance that would have granted him access to classified national security information related to the U.S. Navy. A guideline sentence is appropriate in this case given that Chu's lies created a serious national security risk to the United States.

BACKGROUND

Dr. Chu is a naturalized United States citizen who is originally from Taiwan and holds a doctorate degree in Oceanic studies. Dr. Chu worked for the United States Naval Research Laboratory from 2009 to 2015, where he developed and implemented air-ocean-wave forecast models exclusively for the U.S. Navy – including a model called the Navy Coastal Ocean Model (NCOM). During this time, Dr. Chu held a security clearance and had access to classified military information.

In 2015, Dr. Chu stopped working for the U.S. Navy and began working for the National Oceanic and Atmospheric Administration (NOAA). In December 2021, Dr. Chu, while living in Taiwan without NOAA's knowledge or approval, applied for a three-year detailed assignment to the U.S. Embassy in Singapore working for the U.S. Navy in the Office of Naval Research Global. On April 6, 2021, Dr. Chu was provisionally selected and assigned to the Singapore Office for the three-year detail. However, prior to starting this position, he was required to apply for and obtain a Secret security clearance so that he could have access to classified national security information.

Shortly after Dr. Chu was notified of his provisional selection, he returned to the United States to apply for and obtain his security clearance. In August 2021, Dr. Chu completed and submitted a security clearance application. The application asked Dr. Chu multiple questions about his activities overseas and his connections

2

with foreign governments and businesses. However, Dr. Chu made numerous false statements on his security clearance application that were designed to hide from the United States government the fact that Dr. Chu had recently worked on a classified project for the Taiwanese Navy involving NCOM – the same modeling software Dr. Chu developed and implemented for the U.S. Navy. Dr. Chu repeated those lies a second time when he was interviewed under oath by federal background investigators; and repeated them yet a third time when he signed an affidavit regarding his security clearance application.

The investigation of Dr. Chu's lies revealed that his work for the Taiwanese Navy was extensive in that:

- ***Dr. Chu performed the work over the course of several years.***
  Dr. Chu's criminal conduct was not a momentary lapse of judgment, nor is it excusable by the impetuosity of youth. Rather his actions were calculated, systematic, and repetitive. Dr. Chu's emails show that starting in 2016 and continuing until 2018, while still working for the United States government, Yifei "Philip" Chu secretly worked for a Taiwanese company and the Taiwanese Navy on a classified Taiwanese naval project.

- ***Dr. Chu provided the Taiwanese with assistance on the same modeling software he developed for the U.S. Navy.***
  During Dr. Chu's employment with the United States Navy Research Laboratory during 2009-2015, he was involved with the development and implementation of air-ocean-wave forecast models for the U.S. Navy, which included the Navy Coastal Ocean Model (NCOM). Dr. Chu was contacted by a Taiwanese University Professor on behalf of a Taiwanese company. The Taiwanese Company wanted Chu's NCOM expertise so that he could work on developing and implementing a NCOM program for the Taiwanese Navy. Moreover, the Professor told

3

Dr. Chu that because the sensitive project related to the implementation of NCOM in Taiwan, the project could not be discussed anywhere except at the Taiwanese military naval base. Dr. Chu was also told that because of his expertise (which he obtained while working at United States Naval Research Laboratory) his involvement was essential, and that was why the Professor recommend Dr. Chu to help with this classified project. Dr. Chu eagerly agreed to work on the Taiwanese Navy project. Dr. Chu told the Professor that he "…would be delighted to collaborate with you on the proposal if you think I could help in model development, implementation and operations."

- ***Dr. Chu traveled to Taiwan on multiple occasions to perform the work at a Taiwanese naval base.***
  Through various email exchanges, Dr. Chu confirmed his contracted work in Taiwan for "the Navy project" would take place at the (Tsoying) Naval Base in Kaohsiung, Taiwan. Dr. Chu arranged his first visit to the Taiwanese naval base in Kaohsiung from November 29, 2016, to December 2, 2016. For his first visit, the Taiwanese University Professor developed a schedule with Dr. Chu to conduct a six-hour lecture and provide technical assistance to "get the NCOM model working correctly" on the "Navy base" and was instructed that Dr. Chu could only talk about the navy project while on base. Additionally, Dr. Chu was instructed to bring two forms of Taiwanese identification to enter the Navy base in Kaohsiung. One of the suggested forms of "Taiwan ID" was for Dr. Chu to bring his passport.

The Taiwanese University Professor planned Dr. Chu's second visit to the Taiwanese naval base in Kaohsiung on April 6, 2017, to April 7, 2017. Like his previous trip to Taiwan, Dr. Chu was told his travel expenses to Taiwan would be covered by the Taiwanese University and the Taiwanese Company.

For Dr. Chu's third visit to the Taiwanese naval base in Kaohsiung, Dr. Chu communicated with representatives from the Taiwanese Company and Taiwanese military personnel from Taiwanese Naval, including the Director. Throughout these communications, Dr. Chu planned to participate in a seminar, sponsored by the Taiwanese Navy. The seminar was stated to be held on December 18, 2017, and was organized by Taiwanese Naval Office through the Naval Command of the Ministry of National Defense and was held at the Yihai Building, located on the Taiwanese naval base in Kaohsiung. After his arrest, Dr.

Chu confessed he had gone to the Taiwanese naval base in Kaohsiung. Dr. Chu identified the location of the navy base on a map of Kaohsiung, Taiwan and identified the building he visited from an image depicting the Yihai Building on the navy base. Further, Dr. Chu confessed he did not have free range while on base – rather, he was escorted from the gate of the base to the building for Taiwanese Naval Office, where he performed his work for the Taiwanese Navy.  Dr. Chu travelled to Taiwan to work on Taiwanese Naval project on three separate occasions:

> November 24, 2016, to December 5, 2016;
> March 30, 2017, to April 10, 2017; and
> December 17, 2017, to January 9, 2018

- ***Dr. Chu worked for Taiwan while also working for NOAA, and without NOAA knowledge or permission.***
  Dr. Chu was never granted approval for official travel to Taiwan while he was employed at NOAA. Interviews of Dr. Chu's supervisor and the Director of the NOAA GLERL in Ann Arbor, Michigan revealed Dr. Chu was never approved to conduct work in Taiwan.

  Also, in 2020 - 2021, Dr. Chu slyly lived in Taiwan for nearly a year. From May 23, 2020, until April 24, 2021, while still employed at NOAA, Dr. Chu chose to leave the United States, quietly travelling under his Taiwanese passport, to live in Taiwan. Dr. Chu, without his employer's knowledge or approval and direct violation of his telework agreement, misled his employer and supervisors. During the entirety of his absence Dr, Chu never told his employer nor supervisors that he left the country. Rather, his NOAA supervisors believed him to be living and working from his residence in Ypsilanti, Michigan during the entirety of his time in Taiwan. NOAA records also confirmed that Dr. Chu was never granted official approval for any of his travel to or from Taiwan during this period.

   Dr. Chu likewise consistently lied during his background investigation by first failing to disclose his travel and 11-month residence in Taiwan from 2020-21, to outright denying such when directly asked. When he was challenged with proof of his travel, he initially asserted that "I forgot."  When confronted with the absurdity of such a claim, he changed his story again. His new assertion was he travelled to Taiwan to care for his elderly parents.

- ***Dr. Chu received compensation for his work, which he attempted to hide.***

  Emails between Dr. Chu and the Taiwanese Company show that he agreed to receive "$10'000 per month" (New Taiwanese Dollars) to cover his "per diem" while in Taiwan. Financial and other records show that Dr. Chu received 14 payments of 10'000 NTD from November 2016 to December 2017 and reimbursement for flight expenses to Taiwan on three occasions. These monies were deposited into a Taiwanese Bank account that Dr. Chu had previously created. During his security clearance investigation, Dr. Chu continually denied the existence of this account until he was confronted with its existence. Dr. Chu then falsely asserted that it was generally an inactive and very old account that he had from years ago. Additionally, he went on to claim that it only had about $150 in the account despite the fact he had used the account (as well as other accounts) to send tens of thousands of dollars to himself in the United States.

- ***Dr. Chu took steps to hide his work for the Taiwanese navy from NOAA and the U.S. government.***

  Dr. Chu was fully aware what he was doing was wrong. If caught, he sought to perpetuate the illusion that he was involved in academic pursuits during his travels to work on the classified Navy project rather than engaging in inappropriate behavior. For example, in trying to hide his movements, Dr. Chu discreetly obtained a new Taiwanese passport. This was a significant event because during the process of obtaining his job with the U.S. Naval Research Laboratory (NRL) in 2009, Dr. Chu "renounced his citizenship" with Taiwan and destroyed his Taiwanese passport so that he could get his classified – Secret - clearance at NRL. Yet in November 2017, having destroyed his Taiwanese passport and renouncing his Taiwanese citizenship, Dr. Chu surreptitiously obtained a new Taiwanese passport which would allow him to not disclose his foreign travel on his U.S. passport, and would grant him access to the Taiwanese Naval Base.

  Furthermore, as part of falsely crafting his cover story Dr. Chu also drafted his own invitation letter and requested a letterhead "invitation" from the University Professor for Dr. Chu to be the keynote speaker at the Taiwanese University. Dr. Chu requested that the letter include the

dates which would coincide with his consulting work with the Taiwanese Navy. In doing so, Dr. Chu also attempted to create the appearance of a purely academic endeavor and sought approval for official travel to Taiwan from NOAA. Tellingly, Dr. Chu failed to disclose to NOAA the purpose of the seminar in Taiwan was in support of the Taiwanese Navy. Additionally, he failed to reveal his consulting role with the Taiwanese company and his work for the Taiwanese Navy. However, when pressed by NOAA to provide more information about the purpose of his travel, Dr. Chu withdrew the request. Despite being denied official travel, Dr. Chu nevertheless used his annual leave and travelled to Taiwan to consult with the Taiwanese Navy.

On March 28, 2023, Dr. Chu pled guilty to two offenses related to his false statements as part of his security clearance application: Falsification of Records in a Federal Investigation, in violation of 18 U.S.C. § 1519, and Making a False Statement, in violation of 18 U.S.C. § 1001. The government recommends that the Court impose a sentence of 13 months imprisonment given the repeated and serious nature of Dr. Chu's deceitful conduct.

## ARGUMENT

In fashioning a sentence, a court shall consider, among the other factors set forth in 18 U.S.C. § 3553(a), "the nature and circumstances of the offense," "the history and characteristics of the defendant," the need for "just punishment," the need for "adequate deterrence to criminal conduct," and the applicable sentencing guidelines.

A.     The Sentencing Guidelines

The Sentencing Guidelines "should be the starting point and the initial benchmark" for choosing Dr. Chu's sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007). This is because the Guidelines "reflect a rough approximation of sentences that might achieve section 3553(a)'s objectives." *United States v. Rita*, 551 U.S. 338, 350 (2007).

The United States Probation Department determined that Dr. Chu's sentencing guideline range is 15 to 21 months imprisonment. In calculating this range, the Probation Department correctly determined the base offense level to be fourteen (14) points under Guideline § 2J1.2. The Probation Department then determined that the Specific Offense Characteristic under § 2J1.2(b)(2) applied as the defendant's conduct resulted in a substantial interference with the administration of justice in that he caused the government to unnecessarily expend substantial resources. As such, the base offense level was increased by three levels, with a resulting adjusted offense level of seventeen (17) points.

However, the parties agreed in Dr. Chu's Rule 11 plea agreement to recommend that he not be assessed the three-level increase under § 2J1.2(b)(2). (ECF No. 30, PgID.246). Consistent with this agreement, the government recommends that the Court not apply § 2J1.2(b)(2) and find that Dr. Chu's Guideline

range is 10-16 months. Also consistent with the Rule 11 plea agreement, the government recommends a sentence in the middle of this range, namely 13 months imprisonment.

The defendant asks this Court to wholly ignore the sentencing guideline calculation and suggests that this Court should grant a significant downward variance of "time served" because of the defendant's pre-trial and home detention, and his current unemployment and lessened professional reputation. The Court need not, and should not, do that. *Gall* requires the Court to fashion Chu's sentence using the § 3553(a) factors. None of the defendant's proposed reasons (pre-trial detention, current unemployment etc.) are § 3553(a) sentencing factors. *United States v. Robinson*, 669 F.3d 767 (6th Cir. 2012). Rather, those factors require his sentence to be sufficient to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense[,]" see § 3553(a)(2)(A), "to afford adequate deterrence to criminal conduct[,]" see § 3553(a)(2)(B), and "to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct [,]" see § 3553(a)(6).

### B.   The Nature and Circumstances of the Offense

Lying on a security application is not a routine and mundane offense as defendant suggests in his memorandum by suggesting that telling the truth would

slow down the background investigation. To the contrary, a robust background investigation is necessary to ensure the protection of classified national security information.  Moreover, it is an extremely serious offense especially when the Court considers the job that the defendant was provisionally approved to do. If successful in obtaining his security clearance the defendant would be granted access to United States Naval information at the "secret" level. Any unauthorized disclosure of secret information could cause serious damage to national security. As the Science Director at the U.S. Embassy in Singapore the defendant would have no direct Naval Supervisor at the Embassy. He alone would oversee the U.S. Navy secrets while at the Singapore Embassy.  It is especially concerning because among the various duties and responsibilities that the position of Science Director at the Office of Naval Research Global was to fulfill, the defendant was tasked to actively connect with other foreign experts to facilitate effective technical interchange.  In essence the defendant would be solely responsible for self-policing himself while being granted access and trusted to not share the U.S. Navy's secrets while engaging in technical interchanges with foreign governments including Taiwan. His clear lack of candor, as demonstrated in the case at bar, created a serious national security risk to the United States.

C. <u>History and Characteristics of the Defendant</u>

The defendant asks for a downward sentencing variance.  To his credit he has no previous convictions and has had stable employment in the past.  Despite these positive attributes, the Court should deny his request.  These attributes have already been considered in his guideline calculation and it was his employment which he used to commit the underlying harm to the United States, including his coverup that led to the current charges. Moreover, granting his request would create unwarranted sentencing disparities.

Congress has instructed the Sentencing Commission "shall assure that the guidelines and policy statements, in recommending a term of imprisonment or length of a term of imprisonment, reflect the general inappropriateness of considering the education, vocational skills, employment record, family ties and responsibilities, and community ties of the defendant." 28 U.S.C. § 944(e).  And although a defendant's criminal record is relevant to "determining the applicable criminal history category," USSG § 5H1.8, it is usually not a proper reason for a variance precisely because the guidelines already take it into account. (see *United States v. Kirchhof*, 505 F.3d 409, 415 (6th Cir. 2007) ("[The defendant's] lack of prior criminal history was already taken into account in calculating his guidelines range, and according to the advisory policy statements contained in the guidelines, his other personal characteristics are 'not ordinarily relevant.' " (citations omitted)).  The Sixth Circuit has reasoned that

11

because the Guidelines already account for a defendant's criminal history, imposing an extreme variance based on that same criminal history is inconsistent with "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" under 18 U.S.C. § 3553(a)(6). *United States v. Warren*, 771 Fed.Appx. 637, 642 (6th Cir. 2019) (citing *United States v. Bistline,* 665 F.3d 758, 767 (6th Cir. 2012); see also United States v. *Borho*, 485 F.3d 904, 912–13 (6th Cir. 2007) (finding that a factor "already taken into account in calculating [the defendant's] applicable Guidelines range" does not justify a large variance from the Guidelines-recommended sentence). Similarly, the loss of a job or lessened professional reputation do not justify a large variance from the recommended guidelines as these could be typical ancillary results of any criminal conviction and these consequences do not arise from Chu's sentence. Rather, they arise from his prosecution and conviction, and the Court is required to consider the 18 U.S.C. § 3553 sentencing factors. Section 3553(a)(2)(B) plainly states that "the *sentence* imposed" should "afford adequate deterrence to criminal conduct" (emphasis added). *United States v. Robinson*, 669 F.3d 767, 777 (6th Cir. 2012).

Additionally, USSG § 5H1.5. instructions the Court that the defendant's employment record is not ordinarily relevant in determining whether a departure (or variance) is warranted. If it were proper relevant factor a corporate CEO would get

a significant downward variance due to the loss of his job and the harm to his reputation while an unemployed defendant would be denied a variance when convicted of illegally taking the same amount of money. Rather, if it is to be considered at all, should it not result in an upward variance as it was though the intended and past employment of the defendant which allowed his commission of the criminal offenses?

All the defendant's past charitable works and professional accomplishments do not offset the serious serial criminal conduct committed by him. Additionally, under USSG § 5H1.11, Civic, charitable, or public service and similar prior good work are not ordinarily a proper reason for a variance. He knew how serious obtaining a secret security clearance was because he had previously been granted a secret clearance wherein he was required to destroy his passport and give up his dual citizenship. Yet in November 2017, having destroyed his Taiwanese passport and renouncing his Taiwanese citizenship, Dr. Chu surreptitiously obtained a new Taiwanese passport which would allow him to not disclose his foreign travel on his U.S. passport, and would grant him access to the Taiwanese Naval Base. Importantly, Dr. Chu consistently swore on every occasion he was asked, as part of his background investigation, that he was NOT a dual citizen of Taiwan and the United States. And when asked if he had a foreign passport, he said "No." And even after his arrest he continued to deny his dual citizenship to Pre-Trial Services.

C.    <u>Adequate Deterrence and Unwarranted Sentence Disparities</u>

Here, Chu engaged in long-term on-going duplicitous conduct. The "time served" sentence recommended by Chu fails to reflect the seriousness of the offense or promote respect for the law, especially since he engaged in serial lies to the background investigators, and then to the FBI, Pretrial Services, and the Court well after he knew this criminal conduct was known. Such blatant disregard for the law and his subsequent intentional acts to avoid responsibility cannot be tolerated, let alone rewarded, by granting the substantial downward variance that Chu seeks.

The advisory guidelines create a range so the courts can sentence similar defendants appropriately based upon the severity of their conduct. The sentencing guidelines already take into consideration Chu's lack of significant criminal history and specific conduct in violating Falsification of Records in a Federal Investigation, in violation of 18 U.S.C. § 1519 (a potential 20-year statutory maximum sentence). Additionally, deterrence has both an individualized and more general component, a "time served" sentence would not meaningfully deter Chu or anyone else. Nor would it ensure just punishment.

The defendant does not deny the severity of his conduct. He acknowledges that he unilaterally chose to cover up that he had contact with and worked for foreign entities and individuals. The defendant also knew his contact was not

14

inconsequential, especially since he had met with many of the Taiwanese Navy personally when he worked at NRL, and the defendant has been told by the Taiwanese professor that he was specifically selected because the defendant had been working on the NCOM system while at NRL. Yet he chose to commit additional crimes by serially lying to hide his prohibited conduct.

The defendant agreed to cover up that he had contact and worked for foreign entities to provide the knowledge he gained at NRL, while holding a secret clearance and working on an important U.S. Navy project.  His criminal conduct was not a momentary lapse of judgment, nor was it a situation where the defendant honestly thought it was appropriate to simultaneously work and be paid by the United States government and a foreign power. The defendant clearly knew he could not. He expressly stated such in an interview in April 2021, after returning from his surreptitious 11-month stay in Taiwan and a few months before the filing of his SF-86.

Ironically, in an interview with the Office of Inspector General (OIG) regarding one of his NOAA subordinates, who was believed to be simultaneously working for NOAA and a foreign government, the defendant told the OIG that he knew it was wrong for a NOAA employee to work for NOAA and to be paid by a foreign government without NOAA's knowledge and authorization.  Yet, this Court knows, and Chu has admitted, that he hid his work with a foreign company and

government, ensured he was paid for his efforts, and travelled to provide the information on three different occasions, one of which was on an undisclosed foreign passport. Additionally, he attempted to disguise his illicit conduct under a guise of a purely academic enterprise. Furthermore, he continually and steadfastly denied his illicit actions until he was confronted by the FBI with overwhelming evidence. Moreover, unrepentant, he has continually lied to authorities including Pre-Trial Services, and the Probation Department regarding various factors. A defendant's sentence must "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B). And the sentence—not merely the conviction or negative publicity— must be what provides that deterrence. *United States v. Robinson*, 669 F.3d 767, 777 (6th Cir. 2012).

Anyone seeking to obtain a U.S. security clearance that would grant them access to classified national security information knows it is a serious matter. Especially someone who had previously work for and with a foreign entity, such as this defendant, knows that his actions of lying to cover up past conduct are extremely serious and dangerous. Deterrence may serve to discourage others who are inclined to involve themselves in similar criminal conduct. It conveys that such conduct will carry future consequences. If the defendant were quickly released—only months after being arrested due to a "time served" sentence—it would tell any budding liar eager to gain access to classified information that they need not be concerned about

16

being caught. They can simply avoid any significant punishment altogether. That would send a wildly inappropriate message—both to the defendant and the public at large. Deterrence thus supports a lengthy guideline sentence here.

CONCLUSION

For the foregoing reasons, the government recommends that the Court impose a sentence in the middle of the Guideline range.

Respectfully Submitted,

Dawn N. Ison
United States Attorney


s/ *Ronald W. Waterstreet*

Ronald W. Waterstreet
Assistant U.S. Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226
(313)226-9100
ronald.waterstreet@usdoj.gov

Date: August 3, 2023